STANDARD OIL CO v ZANGERLE et

Common Pleas Court, Cuyahoga Co

Decided March 2, 1939

Frank T. Cullitan, prosecuting attorney and Saul Danaceau assistant prosecuting attorney, Cleveland, for defendants.

Edward Blythin, Cleveland, amicus curiae.

## OPINION

### By LAUSCHE, J.

In the within action the plaintiff is seeking to procure a reversal of an order of the Tax Commission of Ohio in which the Commission determined that certain properties of plaintiff were to be taxed as real estate and not as personal property. The controversy had its origin when the auditor of Cuyahoga County, in making his realty assessments included therein the land, the buildings, and in addition thereto the structures, engines, machinery, tanks, piping, stills, pumps, bubble towers, cracking coils and other property of the plaintiff except the machinery and tools used in what is known as the box factory, can factory, print shop and machine shop which the auditor assessed as personal property. In making his assessment the auditor placed a valuation of $1,166,030.00 on the land exclusive of the improvements thereon, and a valuation of $6,844,000 on the property classified by the auditor as improvements on the land.

The Standard Oil Company, claiming that not only the valuation placed upon the properties but also the inclusion of the machinery, equipment, tanks, etc., into the classification of "improvements on land" was not in conformity with the provisions of the statute, complained to the Cuyahoga County Board of Revision. In this complaint the Standard Oil Company took the position and offered testimony in support thereof that the true valuation of the land exclusive of improvements was $991,125.00 instead of $1,166,030.00 and therefore prayed for a reduction in the valuation of the land in the sum of $174,905.00; and with reference to the improvements on the land exclusive of the land itself, the Standard Oil Company claimed that the auditor erroneously included into the classification of property known as "improvements on the land" personal property of the value of $3,189,244.00, and furthermore assessed the actual legal improvements in excess of their true value. The complainant the Standard Oil Company in

substance requested that its property consisting of the land and improvements thereon be assessed at a value of $3,641,231.00 instead of $8,010,030, and that the residue of the property, in its opinion having a value of $3,189,244.00 be taxed as personalty.

The Cuyahoga County Board of Revision sustained the valuation and classification made by the county auditor. Thereafter in pursuance to §5610, GC, The Standard Oil Company appealed to the Tax Commission and upon consideration of the evidence that was offered before the Cuyahoga County Board of Revision and additional evidence received by the Tax Commission, it made an entry reducing the valuation of both the land and the improvements thereon from $8,010,030.00 to $6,830,475.

The conclusion reached by the Tax Commission of Ohio on the valuations was strictly in accord with the contentions advanced by the Standard Oil Company. The Commission, however, rejected the complaint of the company regarding the error allegedly committed by the auditor, and the Board of Revision in the allocation of certain property into the category of "improvements on land" instead of personal property.

It is to this judgment of the Tax Commission of Ohio that the Standard Oil Company is prosecuting error in pursuance to §5611-1 and 5611-2, GC.

The category into which property was assigned either as land, improvements thereon, or personal property prior to 1931 for the purposes of taxation, except for procedural methods, was of no consequence, because all property, real or personal, prior to that year was by law taxed according to its true value. However, in 1931, Art. XII, Sec. 2, of the Ohio Constitution was amended by abolishing the rule requiring all property to be assessed on a uniform basis. The amendment provided as follows:

"Land and improvements thereon shall be taxed by uniform rule according to value."

In the same year, 1931, the legislature in pursuance to the Constitutional amendment passed the classified tax law which provided that personal property should in general be assessed at 70% of its true value; and that certain types of property used in manufacturing and refining should be assessed at 50% of its true value. Among other provisions requiring property to be listed at 50% of its true value was the following:

"All engines, machinery, tools and implements of a manufacturer used or designed to be used in refining or manufacturing."

It is the claim of the plaintiff (a) that the constitutional provision, "land and improvements thereon, shall be taxed by uniform rule according to value" does not control the taxation of machinery, tanks, pipes and equipment used in refining, even though such articles have been so affixed to the land as to become a part thereof; (b) that from a reading of the provisions of §§5322, 5325, 5385, 5386 and 5388, GC, in connection with each other, it is obvious that the legislature declared that certain property used in refining or manufacturing, even if permanently annexed to the realty must be assessed on the basis of 50% of its true valuation; (c) that the property involved as the subject matter of this litigation is in fact personalty and therefore under any interpretation of the law must be assessed as personal property.

On the other hand the defendant takes the position (a) that under the amended constitutional provision those properties permanently annexed to the land so as to become a part thereof must be treated as improvements on the land and therefore taxed on the basis of a uniform rule applicable to land, and (b) that the sections just hereinbefore mentioned, when read in relation with each other, establish that the legislature did not authorize the assessment of fixtures used in manufacturing or refining at 50% of their true value, and (c) that if the legisla-

ture by said sections did provide for the taxation of articles, which by reason of their affixation to the land became a part thereof at 50% of their true valuation, that such act of the legislature was unconstitutional and void.

It is indeed manifest that the proper allocation of the property of the plaintiff is important for the classification into which the property is placed will determine whether it is to be assessed at 100% or 50% of its true value. Moreover if the property is determined to come within the category of land or improvements thereon, then according to law it shall be evaluated only once in every six years, while if it is allocated to the category other than land and improvements thereon then it shall be evaluated each year enabling the Standard Oil Company to avail itself of the depreciated value resulting from wear and tear, obsolescence and other depreciating influences.

No controversy exists between the parties hereto with regard to the classification of the land, buildings, lighting and plumbing equipment, elevators, sprinkler systems, walls, stacks, paving, foundations, fences, bridges, tunnels, culverts, main water lines, tracks, trestles, main electric power transmission lines, and such other items as are generally appurtenant to land, neither is there any dispute with regard to tools and other equipment such as lathes, millers, planers and other machinery situated in what is known as the box factory, can factory, print shop and machine shop, which have all been classified as personal property. However, all of the machinery, equipment, tanks, piping, crude oil still, vacuum stills, cracking coils, bubble towers, used in refining processes and having a value of $3,189,244.00 according to the appraisal of the plaintiff has by it been claimed to be personalty and taxed as such instead of as either land or improvements on land.

The testimony discloses that the refining plant of the Standard Oil Company has been located on the land in question for about 65 years, and that the crude oil which is refined by it is either piped from its oil wells in other places or brought in by barge to the refinery. Its refining structures constitute in the main a continuous process from which the crude oil is broken down into the many commercial products such as gas, naphtha, kerosene, paraffine distillate, wax, cylinder oil, asphalt and coke.

A separation of these ingredients of the crude oil into their respective classifications is accomplished by subjecting the oil to different temperatures under differing conditions. The process begins when the oil, having been transmitted to the land of the plaintiff mainly by pipe line and sometimes by barge, is refined in what are known as "continuous crude stills." This unit is made up of a battery of ten crude stills constituting a continuous process.

Each of the stills has its separate vapor line running from the crude still to its separate bubble tower where the vapors are purified and then forced into a cooler where they are condensed into liquid form. The proof indicates that these crude stills, vapor lines, bubble towers, and condensing tanks are attached to substantial concrete foundations, built into the ground and designed specifically for the carriage of the crude oil stills. These stills, bubble towers and condensers and connecting pipes are massive in structure and in addition to being held in place by force of their weight are firmly attached by bolts to the concrete foundations upon which they rest.

That part of the crude oil which remains undistilled after it is subjected to the treatment provided by Still No. 10 is then pumped into furnace pipes of what is known as the vacuum pipe still, where it is heated to the temperature of about 800 degrees and then forced into a bubble tower 97 feet high, 18½ feet in diameter, which forms a part of the vacuum pipe still.

The vacuum pipe stills are attached to numerous powerful bolts embedded in concrete foundations erected especially for that purpose. The concrete foundation was designed and built to receive and hold the massive vacuum

stills. Forming a part of this process are also bubble towers having a height of 97 feet and a diameter of 18 feet six inches and made of steel having a thickness of about one inch. These bubble towers are held in place by steel structures consisting of upright steel columns and strengthened by necessary horizontal, diagonal and verticle iron-work. The bubble towers are filled with intricate mechanisms. They weigh about 100 tons.

The ponderousness, mode of annexation, presence of concrete foundations constructed for the erecting of the towers, and the placement of condensers and large soaking drums weighing 465,000 pounds each, the iron structure rising about 100 feet into the air, are in substance identified with the vacuum stills, except that on the vacuum process soaking drums are not used.

The property also assessed as realty consists of steel tanks and miles upon miles of piping leading to and from the different processing structures and the tanks vary in size and are all of cylindrical shape. Their sizes are 20 x 20; 30 x 30; 50 x 36; 80 x42; 40 x 30 and down to 10 x 8. The largest has a capacity of 1,579,253 gallons. Some of these tanks are used for storage purposes of the finished product, while others are used to temporarily store an unfinished product which is to be further treated in one or more of the processes. Concrete dykes planted in and projecting several feet above the ground have been constructed surrounding the tanks. They rest upon the ground by force of their own weight and are only embedded in the soil to the extent of the displacement resulting from their weight.

The land is netted with miles of piping some of which is run in tunnels underground and some overground.

The concrete foundations upon which have been erected the various types of stills project several feet above and below the ground, and cover an area substantially beneath that of the space occupied by the stills, bubble towers, condensers, soakers, asphalt tanks, steam stills, debutanizing towers and other structures. Into these concrete founda-

tions have been embedded foundation bolts which after the carrying structure is placed upon it project through a bearing plate sufficiently to receive a nut to be lengthened and bolted down.

**Do the statutes which are principally in question in the litigation before the Bar provide for the assessment as personalty of that property which has been annexed to the land as to become a part thereof?**

The statutes under which the plaintiff claims that it is entitled to have all of its machinery, stills, coils, pipes, structures and equipment even though permanently annexed to the land taxed as personal property at 50% of its true value are §§5322, 5325, 5385, 5386 and 5388 and read respectively as follows:

**Sec. 5322, GC.** Terms **"real property"** and **"land"** defined. The terms "real property" and "land" as so used, include not only land itself, whether laid out in town lots or otherwise, and all growing crops, including deciduous and evergreen trees, plants and shrubs, with all things contained therein but also, unless otherwise specified, all buildings, structures, improvements, and fixtures of whatever kind thereon, and all rights and privileges belonging and appertaining thereto.

**Sec. 5325, GC.** **"Personal property"** defined—The term "personal property" as so used, includes every tangible thing being subject of ownership, whether animate or inanimate, other than patterns, jigs, dies, drawings, money and motor vehicles registered by the owner thereof, and not forming part of a parcel of real property, as hereinbefore defined; also every share or portion, right or interest, either legal or equitable, in and to every ship, vessel, or boat, of whatsoever name or description, used or designed to be used either exclusively or partially in navigating any of the waters wthin or bordering on this state, whether such ship, vessel, or boat is within the jurisdiction of this state or elsewhere, and whether it has been enrolled, registered, or licensed at a collector's office, or within a collection district in this state, or not.

**Sec. 5385, GC.**—Listing of personal property by a manufacturer.—A person who purchases, receives or holds personal property, of any description, for the purpose of adding to the value thereof by manufacturing, refining, rectifying, or by the combination of different materials with a view of making a gain or profit by so doing, is a manufacturer, and, when he is required to return a statement of the amount of his personal property used in business, he shall include therein the average value estimated, as hereinafter provided, of all articles purchased, received or otherwise held for the purpose of being used, in whole or in part, in manufacturing, combining, rectifying or refining, and of all articles which were at any time by him manufactured or changed in any way, either by combination or rectifying or refining or adding thereto, (separately listing finished products not kept or stored at the place of manufacture or at a warehouse in the same county therewith), which, from time to time, he has had on hand during the year next previous to listing day annually, if he has been engaged in such manufacturing business so long, and if not, then during the time he has been so engaged.

**Sec. 5386, GC.**—Average value, how ascertained.—Such average value shall be ascertained by taking the value of all property subject to be listed on the average basis, owned by such manufacturer, on the last business day of each month the manufacturer was engaged in business during the year, adding such monthly values together and dividing the result by the number of months the manufacturer was engaged in such business during the year. Such result shall be the average value to be listed. "A manufacturer shall also list all engines and machinery of every description used, or designed to be used, in refining or manufacturing, and all tools and implements of every kind used, or designed to be used for such purpose owned or used by such manufacturer."

(The part in quotation was not in original draft but was added thereto prior to passage by the legislature.)

**Sec. 5388, GC.** Rules for listing and assessing personal property.—Excepting as herein otherwise provided **personal property** shall be listed and assessed at **seventy per centum** of the true value thereof, in money, on the day as of which it is required to be listed, or on the days or at the times as of which it is required to be estimated on the average basis, as the case may be. Deposits not taxed at the source shall be listed and assessed at the amount thereof in dollars on the day as of which they are required to be listed. Moneys shall be listed and assessed at the amount thereof in dollars on the day as of which they are required to be listed. In listing investments, the amount of the income yield of each for the calendar year next preceding the date of listing shall, excepting as otherwise provided in this chapter, be stated in dollars and cents and the assessment thereof shall be at the amount of such income yield; but any property defined as investments in either of the first two sub-paragraphs of §5323, GC, which has yielded no income during such calendar year shall be listed and assessed as unproductive investments, at the true value thereof, in money, on the day as of which such investments are required to be listed.

Credits and other taxable intangibles shall be listed and assessed at the true value thereof, in money, on the day as of which the same are required to be listed.

**Personal property** of the following kinds, used in business, shall be listed and assessed at **fifty per centum of the true value** thereof, in money, on the day as of which it is required to be listed, or on the days or at the times as of which it is required to be listed, or on the days or at times as of which it is required to be estimated on the average basis, as the case may be:

(1) All engines, machinery, tools and implements of a manufacturer mentioned in §5386, GC, and all engines and machinery of every description used, or designed to be used in **mining,** and all tools and implements of every kind

used, or designed to be used for such purpose, excepting as provided in the last paragraph of this section, and all engines, machinery, tools, implements and domestic animals used in agriculture, and all machinery, implements and tools used in laundries and dry cleaning plants "except as any of the kinds of property mentioned in this paragraph may have been legally regarded as improvements on land and considered in arriving at the value of real property assessed for taxation."

(Part in quotation was added in 1933.)

(2) The average value of all articles purchased, received or otherwise held by a manufacturer for the purpose of being used, in whole or in part in manufacturing, combining, rectifying or refining; the average value of all articles which were at any time by him manufactured or changed in any way, either by combining or rectifying or refining or adding thereto, but not including finished products unless kept or stored at the place of manufacture or at a warehouse in the same county therewith; and agricultural products on farms.

Boilers, machinery, equipment and personal property used for the generation or distribution of electricity other than for the use of the person generating or distributing the same shall be listed and assessed at the true value thereof in money on the day as of which they are required to be listed; anything in this section to the contrary notwithstanding.

Sec. 5322 in defining "real property," and "land" includes within the meaning of those terms, "unless otherwise specified, all buildings, structures, improvements and fixtures of whatever kind thereon."

Sec. 5325 defines personal property and includes therein with certain exceptions "every tangible thing being the subject of ownership * * * , and not forming a part of a parcel or real property" as defined in §5322.

It will be observed that these definitions of real property, land and personal property explicitly placed property known as "fixtures" into the category of land.

But the plaintiff very vigorously asserts that the legislature in pursuance to the phrase "unless otherwise specified" contained in §5322 excluded from the category of real property by the provisions inserted in §§5386 and 5388, all engines and machinery used in the refining industry, even though they were permanently annexed to the land.

Does the language in §§5385, 5386 and 5388 warrant the conclusion that the fixtures of a manufacturer, refiner, miner, agriculturer, launderer or dry cleaner are to be removed from the definition of land as found in §5322, and translated into the definition of personal property as found in §5325?

It is to be observed that §5385 is styled "Listing of personal property by a manufacturer." An examination of the section also discloses that it deals with all articles purchased, received or otherwise held for the purpose of refining or manufacturing and of all articles which were by the manufacturer changed from their form either by combination or rectifying or refining. The title of this statute is confined specifically to personal property. The articles of property treated by it are obviously of an asportable character either as raw or finished products used and produced by manufacture. §5386 was intended to provide the manner of listing, and the mode of ascertaing the value of all movable property used in manufacturing, obviously because the supply of raw materials and the inventories of finished products change and are subject to fluctuating values.

The last sentence of §5386 is the basis upon which the plaintiff asserts that the engines and machinery of every description used in refining or manufacturing even though they are fixtures are nevertheless to be listed as personal property. It is conceded by the parties hereto that the aforementioned sentence of §5386 was inserted into the statute after the original draft was prepared and immediately before its final passage. But I find nothing in the language of that sentence warranting

the conclusion that it includes fixtures, and this is particularly true, when it is read in relation to the language contained in §§5385 **and 5386.** When that is done it will be found that §§5385, and 5386 as it was originally written, dealt only with personal property and that the added sentence did not import therein the subject of fixtures.

The sentence upon which the plaintiff relies is found in the section which is headed, "average value and how ascertained." The average value to be ascertained is, of course, the value of the personal property discussed in §5385. Thus by implication we may read into the title of 5386 the emphasized words as follows:

"Average value of **personal property** and how ascertained." A reasonable interpretation of the two sections indicates that the last sentence in §5386 can not be construed to mean that all engines and machinery **whether personalty or realty** shall be listed and evaluated in the manner set forth by these sections. In my opinion to so construe the statute would require reading into it language which it does not contain either by expression or implication.

We now come to §5388 the style of which is as follows:

"Rules for listing and assessing **personal property.**"

Moreover the very first sentence in the body of the statute provides that,—

"Excepting as herein otherwise provided **personal property** shall be listed and assessed at 70 per centum of the true value thereof. * * * ."

The context of the first paragraph of this section then proceeds to enumerate certain exceptions to the aforementioned provision, all of which unquestionably come within the classification of personal property. Although the heading, and the first sentence specifically confine the application of the first paragraph of §5388, to personal property, and the context of the section does likewise, the legislature in the third paragraph thereof again clearly indicated that the section was only applicable to personal property by the following provision:

"**Personal property** of the following kinds, used in business shall be listed and assessed at 50 per centum of the true value thereof in money on the day as of which it is required to be listed or on the days or at the times as of which it is required to be estimated on the average basis as the case may be * * * ."

Thereafter this section in sub-paragraphs marked (1) and (2) enumerates the kinds of personal property that are to be assessed at 50% of the true value thereof. It will be noted that paragraph marked (1) deals with all engines, machinery, tools and implements of a manufacturer, refinery, miner, agriculturist, launderer and dry cleaner designed to be used in their respective industries.

The language used in paragraph (1) indicates unequivocally that it was not intended to embrace fixtures. It was enacted in pursuance, and in conformity with the preceding paragraph which read among other things:

"**Personal property of the following kinds** used in business shall be listed and assessed at 50% of the true value thereof * * * ."

Strained interpretation would be required to construe the words engines and machinery to mean fixtures. Moreover if the legislature intended by paragraph (1) to tax what were once chattels, but by reason of their permanent annexation to the land became fixtures, as personal property, it undoubtedly would have specifically stated that,—

"Engines and machinery whether fixtures or personal property shall be taxed at 50% of the value thereof."

The plaintiff has pointed out that certain amendments were made to the law immediately prior to and subsequent to its passage and based upon these amendments argues that the obvious intention of the legislature was to tax engines and machinery used in manufacturing and refining even though permanently annexed to the land as personal property.

Concededly when the language of statutes is ambiguous and an effort is made to ascertain the intent of the legislature the factors pointed out by plaintiff would warrant serious consideration. However, when the language of the statute is not susceptible to an interpretation ascribed to it by a litigant the court is not warranted, even though an examination of the original law and the amendments thereof might possibly indicate a different intent, to construe the statute in contradiction to the plain language used herein. The intention of the legislature in the interpretation of an act of course must be ascertained, but that intention must be gathered from the plain purport of the language used in the statute, unless the language is ambiguous and only then may resort be had to such considerations as are urged to the court in this case.

Considerable importance has been attached by the plaintiff to the last paragraph of §5388 which obviously was intended to eliminate all boilers, machinery, equipment and personal property used in the generation of electricity for commercial purposes from being classified as personal property assessable at either 50 or 70 per centum of its true value. It is clear that in the absence of this paragraph the personal property of the manufacturer of electricity would have been assessable at either 50 or 70 per centum of its value depending upon whether such personal property was for manufacturing purposes.

Obviously the legislature did not intend to extend the benefits of the classified tax law to the manufacturers of electricity and therefore in §5388 definitely excluded from the operation of that section the personal property of the manufacturer of electricity.

Considerable stress has been laid by the plaintiff upon the fact that subparagraph (1) was amended by the legislature in 1933 by adding thereto the exception which appears at the end of the paragraph. In my opinion that amendment did not at all alter the intention of the several sections under discussion as gathered from their plain and direct language.

It is my opinion that a reading of §§5322, 5325, 5385, 5386 and 5388 according to their context for the year 1932 does not warrant the conclusion that all engines, boilers and machinery used in refining constituting fixtures were removed from the definition of real property and were required to be assessed on the basis of personal property. While I am not allowed to ascribe to these sections a meaning in derogation to the unambiguous language therein contained, I would come to the identical conclusion just hereinbefore expressed even though the language in the statutes was ambiguous and it therefore became necessary in ascertaining the intent of the legislature to call upon the various factors to which such importance has been attached by counsel for plaintiff.

It is my conclusion that from the language contained in the various sections heretofore mentioned the legislature intended to tax on the basis of either 50 or 70 per centum of its value such property which in legal contemplation and within the definitions of §§5322 and 5325 is personal in its character. The legislature by the provisions of these sections did not declare that all boilers, machinery and equipment regardless of their character as real or personal property were to be assessed on the basis of 50 or 70% of their value.

To determine whether the articles in question are personal property and therefore taxable according to the will of the legislature and not necessarily

on the basis of their true value, the law as declared by **Teaff v Hewitt, 1 Oh St 511,** and reaffirmed in **Holland Furnace Co. v Trumbull Savings Co., 135 Oh St 48, 13 OO 325,** must be applied to the property here in litigation.

In Teaff v Hewitt the court laid down the following standards that must be present before a thing that was once personalty can become in legal contemplation a part of the realty:

"1st. Actual annexation to the realty, or something appurtenant thereto.

"2nd. Appropriation to the use or purpose of that part of the realty with which it is connected.

"3rd. The intention of the party making the annexation to make the article a permanent accession to the freehold—this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made."

**Are the articles in question sufficiently annexed to the realty to meet the test that before chattels can become a part of the realty there must be an affixation indicating an intent to make the article a part of the freehold?**

Considerable importance was originally ascribed to this criteria of determining the character of property. This test in the early English cases was particularly applicable to ornamental and domestic but not to trade fixtures. It seems that in England originally all property which was attached to the freehold became a part thereof and belonged to the person who owned the land. The operation of the aforementioned rule had a very oppressive effect upon the development of business and industry, for tenants were unwilling to annex trade fixtures to the land and at the termination of their tenancy to suffer a loss of them to the landlord.

Thus early an exception was made to the general rule, that all that is planted in the soil shall become a part thereof, and fixtures used for purposes of trade were allowed to be removed by the tenant before his tenancy expired, and by later decisions within a reasonable time thereafter. The **purpose for** which the article was annexed to the real estate was the test used to determine whether the article continued its character as personalty or became a part of the realty. If the thing was annexed for **purposes of trade** the proprietary interest therein remained with the tenant even though in the removal of the article it was necessary to either damage the article itself or cause damage to the freehold. If the freehold was in any manner damaged the law considered such act as waste and vested the landlord with an action for damages resulting from the depreciation of the value of the estate.

Within the course of time ornamental and domestic fixtures were excluded from the rule that what is planted in the soil becomes a part thereof, and tenants were allowed to remove those articles which the circumstances indicated were not intended to become a permanent part of the freehold. In ascertaining the intention of the tenant the courts considered (a) the nature and character of the thing annexed, (b) the mode of annexation, and (c) the effect that the removal of the thing would have upon the freehold.

Obviously with regard to ornamental and domestic fixtures the courts ascribed special importance to the mode of annexation and the damaging effect that the removal would have upon the land. It seems that with reference thereto a rule was developed requiring physical annexation to either the real estate or something appurtenant thereto before the courts would adjudicate the article to be a fixture.

This rule was soon relaxed and the test of annexation was considered with other criteria in determining what the **intention** of the owner of the chattel was when the annexation was made. That an article could be annexed to the land by force of gravity with which it was attached thereto was not recog-

nized in the early English cases. However, there is now existent a growing opinion that those articles whose permanent accession to the realty can be accomplished as effectively by gravity as by laying them into the soil meet the test of being annexed to the freehold. Thus buildings resting on foundations of timber, heavy machinery, such as engines and boilers resting on timbers and supports, the millstone unattached but held in its place merely by force of gravity, ponderous statuary not imbedded in the soil but held in place merely by its weight (see Sneeker v Warring, 12 N. Y. 170) the furnace in a house (see Holland Furnace Co. v Trumbull Svgs. Co.) come within the rule that gravitational annexation is sufficient to meet the test that before an article can become a part of the realty it must be annexed thereto.

Coming to the properties involved in the litigation before the bar we find that for the many heavy and large tanks, bubble towers, soaking drums, stills, condensers, asphalt tanks, agitating tanks, steam stills, etc., there were constructed special foundations planted into the ground well below the freezing line of the soil and projecting several feet above the ground. Upon these concrete foundations studded with projecting bolts were placed these various articles possessing extraordinary size and tremendous weight and attached and tied down to the foundation by numerous bolts and nuts.

The plaintiffs in the testimony showed that a tank having a capacity of 1,500,000 gallons was capable of being moved on the ground of the plaintiff by dyking the land surrounding the tank and flooding the area within the dykes, thus causing the water to buoy the tanks. It also showed that one of the soaking drums of large size and weighing 465,000 pounds was capable of being elevated and moved from its place. Proof was also offered tending to show that the structural supports for the various articles on the property were capable of being removed by loosening the nuts holding the columns to the foundations and thus by dismantling to move completely the articles in question.

In view of the modern trend of decisions, holding that it is not necessary for every article placed upon real estate before it can become a part thereof to be so firmly annexed as to cause a substantial damage in the act of removal, it is my opinion that the removability of the properties, the criteria upon which the plaintiff rely, are not entitled to the profound consideration which the plaintiff ascribes to them. But even if we were to ask "will any damage result to the freehold or to the articles in question if they are removed from the land" what would the answer necessarily have to be?

In the case of **Concrete Silo v Warsteller, 50 Oh Ap 334, 2 OO 204**, the court held that a concrete silo erected upon a farm as a substitute for an old one that had previously been removed, and requiring an excavation of some eight or ten feet for the placement thereof, and built with its side projecting into a barn so that if the silo were removed it would leave a hole in the ground and a rectangular open space in the side of the barn, was a part of the real estate. The damage that would result from the removal of the silo consisted of the hole that was left in the ground and the opening in the barn.

In the case before the bar if the various articles were removed substantial concrete foundations imbedded in and projecting above the ground would remain upon the property. From the standpoint of whether a damage resulted to the realty I can not see any difference between the situation that existed in the silo case from that which will prevail in the case before the bar.

Were the land in question in this case leased to a tenant it seems perfectly simple that if he proceeded to interlace without authority the land with a network of foundations now built thereon he would unquestionably be charged with waste. The presence of the concrete foundations deeply imbedded in the soil and projecting in the air, with the removal of the usable structures

thereon definitely depreciate the value of the estate.

Forgetting the presence of the foundation and considering for a time only the fact that these massive structures are attached to the foundation by numerous bolts and nuts, does that condition, which makes it possible to remove the structures by dismantling ipso facto remove the articles beyond the claim that they are so annexed to the real estate as to become a part thereof? Under our modern methods of construction it is common knowledge that large buildings, bridges and and other structures are erected by tying the columns to the foundations with bolts. I am disinclined to believe that the accidental fact that a column is attached to a foundation by a bolt instead of being planted in the concrete has any fundamental effect upon the legal criteria respecting the permanency with which the article is annexed to the land.

We must not forget that under the recent decisions and especially as stated in Holland Furnace Co. v Trumbull Savings Company, supra, that annexation sufficient to meet the requirement of the law of fixtures can be accomplished by the weight of the article itself as well as through bolts, concrete or other affixation to the land.

The plaintiff has very vigorously argued that weight and size of an article is not to be considered in determining whether or not an article has become a part of the freehold. In support of this proposition the plaintiff relies upon **Fortman v Goepper, 14 Oh St 558,** wherein it was stated:

"Its size was determined by the demands of the business and would not change its legal character."

While considering the statement in Fortman v Goepper, supra, we must not overlook the declarations made in Teaff v Hewitt, by Judge Bartley wherein he stated that:

"These articles of a ponderous character adapted to the production of the motive power of the establishment were firmly fixed to the structure of that portion of the freehold appropriated to the purpose of the business and clearly intended to be permanent."

He did consider the "ponderous character" of the articles and also that

"They were bolted upon timbers and stone and brick foundations laid in the earth which were re-erected for them."

While it is true that a stone is a stone regardless of the largeness or smallness of its size, it doesn't follow that in the effort to determine with **what intention a stone was placed upon real estate,** that the size and the weight of the stone are not to be considered. That weight, which in logomachy may be simply an accidental feature of an article must under the present law be considered, and logically so, in determining the legal intention with which an article is annexed to land; we need only refer to Holland v Trumbull Savings Co., supra, wherein the court stated that annexation may be accomplished by the force of gravity with which the thing is held in place.

An object held in place by gravity is in fact held in place by weight. The greater the weight the firmer the affixation. Neither am I inclined to subscribe to the argument made by the plaintiff to the effect that a tank 80 feet in diameter and 42 feet high, having a capacity of 1,500,000 gallons and a cubic foot content of approximately 250,000 feet is to be legally considered in the same light as a 42 gallon steel drum possessed by a garageman in his place of business. In attempting to determine **whether the person intended** the article to remain either permanently or temporarily upon the land the size necessarily and logically must be given consideration.

With regard to the many large tanks the legal character of which is in dispute in this case, I am unable to see any difference between the essential

characteristics of the tank and the concrete silo involved in the case of Concrete Silo Co. v Warsteller. The silo owned by the farmer is intended as a container for the grain which he either grows on his land or purchases from other farmers. They usually are made of wood or concrete but they might also be made of steel. The choice of the material to be used in their construction, I assume, depends upon the chemical reaction and the pressure to which it is subjected by the articles contained therein. Apart, however, from the accidental feature that the silo may be made of wood while the storage tank of the Standard Oil Company may be made of metal, in essence they accomplish one and the same purpose. Both are warehouses and only vary in the nonessential mode of construction.

If the silo of the farmer, constructed for the purpose of storing grain, and ordinarily having a cubic content of about four or five thousand feet is a part of the real estate, then the conclusion to me seems inescapable that the tanks of the plaintiff, constructed for the purpose of storing oil and other liquids and having a cubic content of approximately 250,000 feet is likewise a part of the real estate. In respect to this parallel the argument is not justified that the silo on the farm is adaptable to the use of extracting from the land its natural products while the tank on the property of the Standard Oil Company has no relationship to the extraction of the natural deposits from the land.

What is meant by the second test designated in Teaff v Hewitt, that among other things, an article before it can be deemed a fixture must have an

"application to the use or purpose to which that part of the realty with which it is connected is appropriated."

Does it mean that the use of realty can never be appropriated to manufacturing purposes? Does it mean that the article attached to the realty must have a relationship to the extraction of the natural resources from the earth or to the use of the land as a residence or building site? The plaintiff in its reply brief in discussing **Twentieth Century Heating & Ventilating Company v Home Owners' Loan Corporation, 56 Oh Ap 188, 8 OO 237, Kalamazoo Stove v May, 16 Abs 498,** and **Brennan v Whittaker, 15 Ohio 446,** states that in these cases the articles of property in question were declared to be a part of the land only because they were related to the use of the land as residence, or in the extraction from the land of its natural resources. It seems to me that if the test of "adaptation to use" means that the article annexed must have a utilitarian relationship (a) to the extraction from the land of its natural resources and vegetable growth, (b) or to the use of the land for dwelling purposes, (c) or to the use of a manufacturing building, distinguished from the temporary industry therein situated, then obviously an article regardless of how permanently attached and how certain the intention was to make it a part of the freehold would never become a part thereof, unless it was correlated to the land as above indicated.

The plaintiff seems to concede that even machinery not forming a part of the mechanism and designed for the generation of motive power if **permanently attached to the land or something appurtenant thereto** may become a fixture even though it is not adaptable or appropriate to the general use of the land. If a chattel under such circumstances can become a part of the land, even if not adaptable to the use to which the land is put, it does so in violation of the tests laid down in Teaff v Hewitt. It seems to me that the moment we concede that the machinery attached to land for purposes other than hereinbefore described can become merged in the land, we then establish the fact that there are other uses to which the land can be appropriated than those hereinbefore mentioned.

In **Hocking Power Co. v Jackson, 8 Abs 448,** the court in determining whether the assessment against a par-

cel of real estate was in excess of 1/3 of its value had to adjudge incidentally the legal criterion of certain large electrical transformers which if part of the realty made the assessment valid, and if not realty, then invalid, the question of the use of the land though not discussed by the court is present by conspicuous implication.

In the opinion Judge Blosser said:

"The lot in question has been improved by fencing and placing thereon a lot of slag and cinders, a garage, a sub-station structure consisting of four upright steel posts resting on concrete. Surrounding this is a permanent and expensive metal fence and guard wire. Inside of these uprights are the transformers, which rest upon a concrete base fifteen feet square which is embedded in the soil. These transformers are very heavy and are held in place by gravity, and are not bolted or otherwise fastened except that they are attached and connected by electric wires. If these transformers may be regarded as fixtures then there can be no question but that the value of the property exceeds three times the amount of the assessment."

When the tests prescribed by Teaff v Hewitt are applied to the judgment of the court it is obvious that the transformer was held (a) sufficiently annexed to the land, (b) adaptable to the use to which the land was appropriated, (c) intended to be made a permanent part of the land.

Manifestly the transformer was not adapted to the employment or the extraction of the natural deposits of the land; nor was it susceptible of classification as the ponderous machinery used for generating motive power for general use in a building constructed on the land. The conclusion is inescapable that the court held that the transformer was adaptable to the use to which the land was intended to be dedicated. See also **Brennan v Whitaker, 15 Oh St 446; Flueger v Lewis Foundry & Machine Co., 14 Ohio Fed. Dec. 677;** Willis v Beeler & Schumacher,

90 Fed. Rep. (2d) 538.

Paragraph 5 of the syllabus of **Teaff v Hewitt, 1 Oh St 511,** reads as follows:

"The machinery in a woolen factory, consisting of carding machines, spinning machines, power looms, etc., connected with the motive power of the steam engine by bands and straps, but **in no wise attached to the building** in which used, except by cleats, or other means to confine them to their proper places for use, and subject to removal whenever convenience or business may require without injury, are not fixtures, but chattel property."

This paragraph definitely warrants the inference that machinery, other than the boilers, the steam engines and the machines designed to generate the power, when permanently attached as distinguished from "temporary attachment" become a part of the real estate.

In the same case on page 542, the court stated:

"Fixtures in a manufacturing establishment must be governed by the same criterion, which applies to fixtures in other situations. The machinery and implements in such an establishment, although useful and even essential for the business carried on, which are not permanently affixed to the ground or the structure of the building, and which can be easily removed without material injury to the building or the articles themselves, and their place supplied by other articles of a similar kind are not fixtures but personal property. But that portion of the machinery in such an establishment which is **firmly affixed to the earth or to the structure of the building, and which from its nature, mode of attachment, use, and the relative situation of the party placing it there, was plainly intended to be permanent, is parcel of the freehold."**

The aforementioned statement of Judge Bartley unequivocally implies that machinery of a business, useful and essential to the business, which is per-

manently affixed to the ground or the structure of the building and which can not be easily removed without material injury to the building or the articles themselves are not personal property but fixtures. Judge Bartley in dealing with the steam engine and boilers indicated that these articles were fixtures and therefore formed a part and parcel of the land. In regard to them he stated:

"They were **bolted** and permanently affixed upon the timbers and stone and brick foundations laid in the earth which were erected for them. The building itself was permanent and designed and used for a manufactory and **these articles of a ponderous character** adapted to the protection of the motive power of the establishment **were firmly affixed** to the structure of that portion of the freehold appropriated to the purposes of the business and clearly intended to be permanent."

In the foregoing quoted statement of Judge Bartley (in view of the arguments that have been made in the case before the Bar) it is well to note that the steam engine and boilers were **bolted** to the timbers attached to brick foundations laid in the earth and especially erected for them. Judge Bartley further seemed to lay some stress to the fact that the engine and boilers were of a "ponderous" character.

The plaintiff in this case conceded that the dikes made of concrete which projected several feet above the ground and surrounding the large gasoline tanks for fire protection purposes were a part of the realty. To constitute a part of the realty they must (1) have been permanently annexed to the land, (2) adaptable to the use to which the land was put, and (3) intended as a permanent addition to the freehold. By applying the foregoing tests to the dikes I encounter some difficulty in determining that these dikes, separate and apart, from their relationship to the gasoline tanks which they are intended to protect, are at all adaptable to the general use of the land. If the tanks are personal property and they are therefore subject to removal by the owner and the dikes are real property forming a part of the freehold I am unable to understand how the conclusion can be drawn that these several concrete structures are accessories to the full use and enjoyment of the natural land. Indeed, the same argument is applicable to the large concrete foundations builded specifically for the reception and the retention of the Crude Oil Stills, the Vacuum Pipe Stills, the Cracking Coils, Steam Stills and Asphalt Plant, etc. These foundations, of course, became a part of the land. They did so because they were permanently annexed thereto, were adaptable to the use to which the land was then put and were obviously intended as permanent accessories to the land. In the absence of the refining plant they are in no respect adaptable to the use for which the land is appropriated.

It is admitted by the plaintiff that a pipe line is used to transport the oil used in the refining processes from the oil wells to the land of the Standard Oil Company. The land has been used for the same refining purpose for a period of sixty-five years. Multiple mammoth tanks and structures are built thereon. Miles and miles of piping form to the layman a bewildering labyrinth of transportational facilities. To the ordinary reasonable mind the conclusion is warranted that this land is intended in the absence of some unforeseen and unexpected contingency to be used permanently for refining purposes.

It is my finding of fact that the land involved in this controversy was completely utilized as an oil refining plant and that the structures and equipment thereto annexed were adaptable to that use to which the land was appropriated.

Finally in Teaff v Hewitt, the court said that the party making the annexation must have intended to make the article a permanent accession to the freehold,—the intention to be inferred from the nature of the thing annexed, the relation and situation of the party making the annexation, the structure

and mode of annexation and the purpose and use for which the annexation has been made.

What is the purpose of the annexation?

If this land was in fact permanently devoted to the use of a refinery then the articles in question undoubtedly were annexed for the purpose of being used in the connection to which the land was put. Of course, if the use to which the land of the plaintiff is now being devoted, in spite of all the circumstances indicating that it is intended as a permanent use, is to be considered as a temporary appropriation of the land, then the items in question, of course, have no relationship to the land. But if we concede that boilers and engines in Teaff v Hewitt, and the muley saws in Brennan v Whittaker, and the transformer in Hocking Power Company v Jackson were related to the permanent use to which the building grist mill and land were respectively devoted, then it seems to me that the massive crude oil stills, the vacuum and fractionating and steam stills, tanks, etc., in effect occupy the same relative position to the land in question before the bar.

What was the legal relation and situation of the Standard Oil Company with reference to the land and the articles in controversy?

The exceptions that were originally created to the general rule, that what is annexed to the soil becomes a part thereof, were rooted primarily in the fact that the annexor's relation to the land was that of tenant for life or tenant for years. The courts then held that under such a relationship to the land it was to be presumed conclusively that the annexation was not made for the purpose of becoming a part of the land.

If the relation of the annexor to the land is temporary such as a tenancy, common judgment would indicate that the temporary relationship to the land would be strong proof that the annexation was not proposed to be permanent.

But on the other hand if the annexor is the owner of the land that fact would be of some importance in concluding that the article was purposed as a permanent accession to the land. In the early cases the trade fixtures which the tenant was allowed to remove would if annexed by the owner of the land have definitely become a part and parcel thereof.

The ownership of the Standard Oil Company of the land and the articles annexed thereto constitutes in this case some proof that a permanent annexation was intended to be made.

What is the nature of the articles annexed?

Indeed if the articles brought upon the land were soil for fertilizing purposes, or bricks or lumber constructed into a building or fences used to enclose the land the evidentiary value that the articles were intended to be annexed to the realty would be inseparable because those articles would lose their identity and become merged in the land. Notwithstanding that the articles annexed in this case do not have the nature of being completely lost in their identity by their attachment to the land they have nevertheless become assimilated and merged into the land.

From a consideration of these various factors and the intention, in a minor degree, of the plaintiff as reflected by its acts of previous years when it listed all of the property herein involved as realty, it is my conclusion of fact that the articles involved in the litigation were intended by the plaintiff to become permanently annexed to the realty.